## LAWRENCE v. FOX.

1. LIBEL AND SLANDER—QUALIFIED PRIVILEGE—COMMENT ON CONDUCT OF PUBLIC OFFICIAL—NEWSPAPERS.

Judgment for plaintiff, who was a deputy police commissioner for 8 years, in his action against newspapers and their publishers for libellous articles charging plaintiff with fraud, corruption, protection of criminals, manipulation of liquor licenses, perjury, trickery and deceit is reversed, where trial judge had failed to inform jury that defendants had a qualified privilege as a matter of law in commenting upon the conduct of a public official.

2. COSTS—REVERSAL—NEW TRIAL.

Costs in libel case are ordered to abide result of new trial ordered upon reversal of judgment for plaintiff because of error on part of trial court.

Appeal from Wayne; O'Hara (Chester P.), J. Submitted April 9, 1959. (Docket No. 25, Calendar No. 47,076.) Decided July 14, 1959.

REFERENCES FOR POINTS IN HEADNOTES
[1] 33 Am Jur, Libel and Slander § 169.

Case by Kennedy Lawrence against J. M. Fox and Jack E. MacGriff, doing business as the Redford Record, the Brightmoor Journal, and the Home Gazette, Strathmoor Edition, Floyd E. McGriff and the Redford Printing Company, a Michigan corporation, for libel. Verdict and judgment for plaintiff against defendants MacGriff and McGriff, who appeal. Reversed and remanded.

*Charles S. Toy,* for plaintiff.

*Leo W. Hoffman,* for defendant MacGriff.

*Floyd McGriff, in propria persona.*

SMITH, J. The plaintiff in the case before us, Kennedy Lawrence, was deputy superintendent of police in Detroit from 1947 to 1955. The action he brings is for libel. The libel consisted, according to the pretrial statement, "of a series of articles written by defendants Jack E. MacGriff and Floyd E. McGriff and published in the defendant newspapers, the Redford Record, The Brightmoor Journal and the Home Gazette, which publications were printed by defendant The Redford Printing Company."

We will not preserve for posterity in our printed reports the language employed. It was abusive and extreme, vitriolic in its terms. Suffice for our purposes to say that plaintiff was charged with fraud and corruption, with protection of criminals and manipulation of liquor licenses, with perjury, trickery, and deceit. Few offenses known to the litany of prostitution of public trust were omitted. The plaintiff asserted that these charges were false, that they were known to defendants to be false, and that they were published with malicious intent. In short, that, despite his exemplary record to which eminent

commissioners of police bore witness, and despite his reputation as "an honest cop," the defendants deliberately set out to ruin him personally and professionally from the most evil of motives. Defendants, on the other hand, asserted that they had acted in entire good faith, that their purpose in so writing was to bring to the people of the community the truth concerning corruption in government and that the public responsibilities of a newspaper in exposing wrongdoing in high places gives it a qualified privilege to print such articles in the public interest. The case went to the jury, which awarded plaintiff the sum of $20,000. Defendants-appellants are before us on a general appeal.

There are few areas of the law so obscure in detail as that of the law of defamation. The New Hampshire supreme court recently remarked that "For the most part any thoughtful consideration of the present state of the law of libel either begins or ends with a combined apology and lament." *Blanchard* v. *Claremont Eagle, Inc.*, 95 NH 375, 377 (63 A2d 791). This is due in part to conflicting precedents, many of them having their roots in courts long forgotten, such as the seignorial courts, one of which heard, in the year 1275, a charge that Maud, wife of John, had "attacked the wife of the said Thomas with contumelious words calling her whore and sorceress."[1] At a later period the ecclesiastical courts contributed their doctrine and precedents, followed by that court of evil repute, the court of star chamber.[2] The controlling principles in modern law, however, are neither obscure nor unique. The ultimate problem in the law of defamation, the balancing of

[1] See 1 Select Pleas in Manorial Courts, 2 Selden Society, pp 143, 145, discussed in Donnelly, History of Defamation, 1949 Wisconsin L Rev 99.

[2] See, generally, Veeder, The History and Theory of the Law of Defamation, 3 Col L Rev 546; 4 Col L Rev 33; 2 Pollock and Maitland, The History of English Law (2d ed), pp 536–538.

one man's interests against another's acts, is common to all areas of the law of torts. In respect of negligence we find it in the concept of the reasonable man, in cases of assault and battery, and trespass, we speak of justification and excuse. In the law of defamation the term employed is "privilege."[3]

There is no need, at this date in our history, to urge that it is necessary to free institutions that the press itself be free. Today it is. The real issue before us is how free. Governmental interference is not the only threat to its freedom. On the contrary, a narrow or restrictive interpretation of the law of privilege in libel actions is equally dangerous. The publisher often faces a cruel dilemma: The more serious the charge of wrongdoing by a public official, more urgent the need for its airing. Yet, the more serious the charge, the greater the libel. It is in this uneasy and menacing situation that the law provides the publisher a sanctuary of sorts, the defense of privilege. It is no fortress, as we shall see. The defense interposed is that of privilege.

This defense rests upon considerations of public policy. "The great underlying principle upon which the doctrine of privileged communication stands," we held in *Bacon* v. *Michigan Central R. Co.*, 66 Mich 166, 169, 170, "is public policy. This is more especially the case with absolute privilege, where the interests and necessities of society require that the time and occasion of the publication or utterance, even though it be both false and malicious, shall protect the defamer from all liability to prosecution for the sake of the public good. It rests upon the same necessity that requires the individual to surrender his personal rights and to suffer loss for the benefit of the common welfare." The term privilege, then, having such origins, relates to a situation or occasion

---

[3] See Harper, Privileged Defamation, 22 Va L Rev 642, 643.

in which the importance of the criticism uttered by the defendant (for reasons to which we will in due course advert) justifies a modification, or, indeed, a withdrawal, of the protection normally afforded our citizens. See 1 Harper and James, Torts, § 5.25.

The privilege thus afforded is not, however, as the mathematicians would put it, a constant. It varies with the situation, with what is regarded as the importance of the social issues at stake. At one extreme we have loose gossip, thoughtless or malevolent. Here the damage to the individual's reputation is balanced only against the social desirability of the unbridled tongue, the frenetic lashings of the scorpion's tail. Under the statutes of Edgar and Canute the tongue itself was forfeited.[4] Modern law is more lenient. We class it simply as a case of "no privilege" and leave the parties to their proofs. At the other extreme are those occasions wherein the social interest involved in publication is so great as to immunize even deliberately malicious attacks upon one's character. Thus of judicial utterances, "A communication absolutely privileged—as, for instance, words spoken by a judge in his judicial capacity in a court of justice—is not actionable, even though spoken maliciously." *Trimble* v. *Morrish,* 152 Mich 624, 627 (16 LRA NS 1017). So, also, of words spoken in the course of legislative debate.[5]

---

[4] 3 Edgar, 4 (c. 946); 2 Canute, 16 (c. 1027–c. 1034), translated in The Law of the Kings of England from Edmund to Henry I (Robertson ed 1925), pp 25, 183.

[5] See Yankwich, The Immunity of Congressional Speech—Its Origin, Meaning and Scope, 99 U of Pa L Rev 960, 962, quoting from a petition addressed by Thomas Jefferson to the Virginia house of delegates:

" 'that in order to give to the will of the people the influence it ought to have, and the information which may enable them to exercise it usefully, it was a part of the common law, adopted as the law of this land, that their representatives, in the discharge of their functions, should be free from the cognizance or coercion of the coordinate branches, judiciary and executive.' " (7 Writings of Thomas Jefferson [Ford ed 1896] 158.)

Considerations of social policy similar in principle, but of lesser intensity, result in a privilege not absolute but conditional, or, as sometimes put, qualified, or defeasible. These situations are of a great variety, all of them responding more or less directly to Baron Parke's famous statement in *Toogood* v. *Spyring* (Ex 1834), 1 CM&R 181, 193 (149 Eng Rep 1044) that a publication is privileged when it is "fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned." These are the occasions in which one has not an absolute but a limited immunity to speak or publish words in and of themselves defamatory. What circumstances, then, present this "occasion" of qualified privilege? Who decides whether or not the occasion presented is such? These are our initial questions.

They are not new to our Court. In *Bowerman* v. *Detroit Free Press,* 287 Mich 443 (120 ALR 1230) we described the term *occasion* as meaning "the extrinsic situation" presented. In that case, as the court pointed out (p 447), "The extrinsic circumstances in the instant case are that defendant's newspaper was reporting a judicial proceeding." Likewise in *Westerhouse* v. *DeWitt,* 215 Mich 295, we approved an instruction defining the occasion as a meeting of the elders of a church, called to consider, investigate, and adjust the differences between its members. The term *occasion,* then, refers to time, place, and people. Was it a testimonial dinner or a gathering in a saloon? Was it a trial at law, legislative debate, or a brawl in the alley? At this point we are looking at the stage, not at the script.

As is true generally with respect to matters of privilege, it is for the court to determine whether or not the external circumstances surrounding the publication are such as to give rise to a privileged

occasion. In so doing, the court is exercising its normal exclusive function of determining what principles of substantive law are applicable to the situation presented. In making the determination as to the privilege of the occasion, the malice charged by the plaintiff is not considered. We so held (in accordance with the great weight of authority) in *Westerhouse* v. *DeWitt, supra,* 299, stating that "the question of privilege is to be determined by the occasion and not the language used." In *Garn* v. *Lockard,* 108 Mich 196, quoting an earlier case, we had held similarly, stating (p 198) that " 'The occasion determines the question of privilege. The language is only proper to be considered in connection with the question of malice.' " See, also, *Fortney* v. *Stephan,* 237 Mich 603, where, as here, the publications charged a law-enforcement official with criminal acts. It was there insisted, on behalf of plaintiff, that there was no question of privilege in the case, since "the publications charge the plaintiff with criminal conduct, and an intentional neglect of his duties as sheriff." We held to the contrary. "Counsel is in error," we held (p 609), "because it is the occasion and not the language of the publication that creates the privilege." Of course, a question may be presented as to whether the extrinsic facts (as distinguished from the words themselves) are such as to justify the finding of an occasion of privilege in the first place. An issue may arise as to whether the defamatory words were spoken on the floor of a senate or the floor of a tavern. But lacking such factual issue as to the occasion, the matter of privilege is for the court.

3 Restatement of Torts, § 619, comment (a), phrases the matter thus:

"Whether a privilege exists at all is a question for the court. This requires the court to determine whether the circumstances under which the publica-

tion was made were such as, under the rules stated
in §§ 585–599, to make the occasion privileged. This
is true whether the issue involves the existence of
an absolutely privileged occasion or one that is only
conditionally privileged. If the facts are in dispute,
the jury is called upon to consider the evidence and
pass upon the issues thus raised. It is for the court,
however, to decide whether the facts found by the
jury made the occasion privileged or to instruct the
jury as to what facts they must find in order to hold
the occasion privileged."

With respect, also, to this phase of the case,
namely, the establishment of the privilege of the
occasion, we will note that the burden is on the de-
fendant. As Prosser puts it (Torts [2d ed], § 95 at
p 629):

"The burden is upon the defendant in the first
instance to establish the existence of a privileged
occasion for the publication, by proof of a recognized
public or private interest which would justify the
utterance of the words."

To like effect is our decision in *Day* v. *Backus,* 31
Mich 241, wherein it was held (syllabus 1) that:

"In an action of slander for words contained in a
letter written by defendant  *  *  *   the burden of
proof is on the defendant to show that it was thus
privileged."

To be distinguished from the privilege of the oc-
casion is the matter of the abuse thereof. The con-
ditional privilege, asserted by defendants in the case
before us, is, as the terminology suggests, a privilege
subject to defeasance, subject to a condition, the
condition being its exercise without abuse. Abuse
may take place in many ways. It may arise from
lack of good faith in making the publication, *Mundy*
v. *Hoard,* 216 Mich 478, the primary motive being
the gratification of personal hostility, spite, or ill-

will, or, as sometimes put, *Fortney* v. *Stephan, supra,* publication "with actual malice." Abuse, also, may arise "if the extent of its publication be excessive," *Smith* v. *Smith,* 73 Mich 445, 446 (3 LRA 52, 16 Am St Rep 594). In other words, the protection which the occasion gives is "conditioned upon the manner in which the privilege is exercised. The unreasonable exercise of privilege is an abuse of the occasion which defeats the protection otherwise afforded." 3 Restatement of Torts, § 599, comment (a). The case before us, in fact, involves allegations of precisely such abuse. Here it was asserted not only that the charges against plaintiff were false, but that "they were made maliciously and with spite," whereas in defense thereof it was asserted not only that the newspapers had a qualified privilege but that the statements made were said "in good faith and without malice."

The fact, then, that it is determined that the occasion is conditionally privileged does not mean that the publisher (whether newspaper or other) has carte blanche to deal recklessly with the most jealously guarded possession of a public official, or, indeed, of any citizen, his good reputation. Yet the conditional privilege does afford the publisher a degree of protection. He is not liable for absolute truth, it being required only, as we held in *Powers* v. *Vaughan,* 312 Mich 297, 305, quoting *McAllister* v. *Detroit Free Press,* 76 Mich 338, 356 (15 Am St Rep 318), that the statement made be "honestly believed to be true, and published in good faith." See, also, *Howard* v. *Dickie,* 120 Mich 238, 241;[6] 15 MLP,

---

[6] "The case, then, must turn upon the question whether malice was made out by proof that the charges made were not true in fact, without additional evidence that they were known by the defendant to be true. If the privilege is to prove of actual value to the defendant, it would seem that it is quite unsafe to say that evidence that the statements made are untrue in fact establishes malice. The truth of the words may always constitute a defense. To remove privilege by

Libel and Slander, § 21.   It was once held (*Owen* v.
*Dewey,* 107 Mich 67) that a publisher's reasonable
belief in the truth of the publication made, or prob-
able cause for belief in truth, or good faith belief
in truth, would not relieve him of responsibility for
libel, but this case was obviously overruled *sub si-
lentio* in later cases noted herein and has not been
cited to this point in the last 50 years.

Here we see the importance of the sources relied
upon by the publisher.   If the source of the pub-
lisher's information is a person or organization of
probity and good repute the jury would have war-
rant to find that he honestly believed that what he
published was the truth and, thus, that his qualified
privilege was not abused.   On the other hand, if his
source were notably mendacious there might well be
warrant to find otherwise.   For this reason, evidence
bearing upon the source of the publisher's informa-
tion is not only relevant but crucial to the question
of the protection of the qualified privilege.

The immunity of the conditional privilege, then,
fragile though it may be, is not without value to the
defendant charged with defamation.   The newspaper
(or any) publisher, commenting upon the perform-
ance of duties by a public official, stands before the
jury initially (unlike the malevolently officious fish-
wife) wearing his vulnerable cloak of privilege.   It is

---

evidence of the untruth of the words spoken would therefore leave
one acting under a qualified privilege in practically no better at-
titude than one who can plead no such privilege.   This question was
before the court of queen's bench in *Fountain* v. *Boodle,* 3 QB (Adolph
& E NS) 5 (114 Eng Rep 408).   It was said by Patteson, J. (p 10),
'Falsehood in fact is no proof of malice, unless the proof involves
knowledge of the truth.'   In *Sommerville* v. *Hawkins,* 10 CB 583 (138
Eng Rep 231), it was said that the supposition that defendant believed
the charge is always to be made when the question *is* whether a com-
munication is privileged or not.   In *Harris* v. *Thompson,* 13 CB 333,
352 (138 Eng Rep 1228), it was said by Williams, J., citing *Fountain*
v. *Boodle*: 'The mere circumstance of the statement being false will
not suffice to show malice, unless there *is* some evidence to show that
the defendant knew it to be false.' "

the plaintiff's burden to destroy it, to prove such abuse that the privilege is lost. "Where it appears that the occasion is subject to a qualified privilege, the burden is upon the plaintiff to prove the untruth of the statements and actual malice." *Van Vliet* v. *Vander Naald,* 290 Mich 365, 371; see, also, *Timmis* v. *Bennett,* 352 Mich 355; *Bostetter* v. *Kirsch Company,* 319 Mich 547.

In short, at this point 2 questions are presented. The first is whether or not the occasion upon which the words were spoken was a privileged occasion. This determination is for the court and the burden of proof is upon the defendant asserting the privilege. If, however, the privilege is qualified, a further question remains, whether or not the privilege of the occasion was abused. Here the problem is one for the jury, under proper instructions, and with respect to it the plaintiff carries the burden of proof. "The question whether the occasion is such as to rebut the inference of malice if the communication be bona fide is one of law for the court; but whether *bona fides* exist is one of fact for the jury." *Timmis* v. *Bennett, supra* 367, quoting *Bacon* v. *Michigan Central R. Company,* 66 Mich 166, 173.[7]

Such are the controlling issues and such are the parties' burdens with respect thereto. It is just at this point that we find appellants' primary assertion of error. "Was it error," runs appellants' first question, "for the trial court to submit the question of qualified privilege to the jury and to refuse to charge the jury that defendants were protected by qualified privilege as a matter of law?" In more detail, the court, assert appellants, "after defining qualified privilege in general terms, left it to the jury to determine as a matter of fact whether or not defendants

---

[7] A recent review of the problems presented in comment upon public officers and candidates for office is found in *Catalfo* v. *Shenton* (1959), 102 NH 47 (149 A2d 871).

were entitled to the defense of qualified privilege."
The court's charge with respect hereto was in large
and pertinent part as follows:

"Now, what is a qualified privilege as claimed by
the defense? You are charged that by reason of the
circumstances surrounding the publication of the
articles and the position and business of the parties
a qualified privilege may exist. A qualified privilege
is a right to publish the articles if the publishers have
reason to believe them to be true, publish them in
good faith and without malice. In determining
whether or not a qualified privilege did exist in this
case, you are charged that the publishers of news-
papers owe a duty to publish matters of public inter-
est and are not required to determine the exact truth
or falsity of what they publish, provided they be-
lieved what they published to be the truth and pub-
lished them in good faith. You are also charged that
facts and circumstances may give rise to a qualified
privilege for the protection of the defendants, pro-
vided such facts and circumstances exist or are rea-
sonably believed by defendants to exist which cast
a duty upon them in the interest of society to write
and publish concerning said facts and circumstances.

"Now, there are places in this law suit where with-
out question a qualified privilege would exist, but
the declaration is so long, with so many things in it,
that it would take me hours to go over the speci-
fication, allegation by allegation. If there was an
occasion such as I am going to define now to you
that did exist in connection with any of these various
claims of libel on the part of plaintiff, then the
qualified privilege would arise and the burden would
be upon the plaintiff, as I will tell you in a moment,
to prove both falsity and actual malice."

In so charging, the court was in error. This ques-
tion of privilege is one for the court itself, and it is
not to be divided between court and jury, despite the
length and complexity of the charges and counter-

charges, unless there are questions relating to the extrinsic circumstances of the occasion requiring the jury's resolution. Such are not pointed out to us and our examination of the record discloses none. The occasion was clear. A newspaper was commenting upon the performance of duty by a public official. In such circumstances the law does not leave it to a jury to say whether or not the occasion is one of qualified privilege. This question, as we have seen, and for the reasons we have seen, is one of law for the court. Here, as defendants correctly asserted, the circumstances were such as to invest the defendants with a qualified privilege and the jury should have been so informed. It then remains for the jury, under proper instructions, to pass upon the maintenance or the destruction of the privilege.

In view of our remand for new trial a caveat should be observed. With respect to unprivileged defamation, malice in law is implied. "The existence of ill will or the absence of honest belief remains important where the exercise of a qualified privilege is in question, and it may affect the measure of damages to be imposed, particularly as to punitive damages, but it is not at all essential to liability in the first instance."[8] Thus we have held, in a case not involving privilege, that the fact that defendant merely repeated defamatory matter, current in the community, that he believed to be true, went only to mitigation of damages. *Darling* v. *Mansfield*, 222 Mich 278 (34 ALR 1). Here, however, we are in the area of qualified privilege. The showing of malice required for the forfeiture of the privilege is not presumed but is a matter for proof by the plaintiff, and evidence of lack of malice (*e.g.*, source and bases of information) may be introduced to sustain the privilege in the face of attack upon it, as well as in mitigation

---

[8] Prosser, Torts (2d ed), § 94, p 602.

of damages should the privilege fall. See *Fortney v. Stephan, supra.* Moreover, if evidence of what defendants published concerning others is to be received as evidence of their state of mind, and intent, and as bearing upon the presence or absence of actual malice, it follows from what has been held that they are not to be foreclosed from a showing of their sources of information with respect thereto and their grounds therefor.

Assignments of error not included within the foregoing are deemed unnecessary to decision in the case. There is no merit in the additional issue raised by joint defendant and appellant Floyd McGriff, in his appeal *in propria persona,* that the trial judge "erred in denying his personal bias, prejudice and interest against the defendant in favor of plaintiff and his attorney." The record does not sustain such allegations, either as a matter of fact or of law.

Reversed and remanded for new trial. Costs to abide the final determination of the case.

BLACK and VOELKER, JJ., concurred with SMITH, J.

DETHMERS, C. J., and CARR, and KELLY, JJ., concurred in result.

EDWARDS and KAVANAGH, JJ., did not sit.